May it please the Court, Counsel, I'm Erin Lageson on behalf of the Superintendent of Jean Hill, who's from the State of Oregon. At one housekeeping matter, Judge Coffin, who is the Magistrate Judge who decided this case, asked Counsel to convey a message to the panel, and that is, Petitioners filed a motion for release pending this appeal in the District Court, and Judge Coffin held a hearing on it on Friday. And I didn't attend that hearing, but the lawyer from our office that did told me that Judge Coffin asked for Counsel to communicate to you that he is considering this motion for release. Mr. Hester was there, and hopefully if there's anything else that I was supposed to communicate, he can fill you in on that. What happened before? Wasn't there a decision by this Court refusing release pending appeal? Is that right? Well, he stayed the judgment pending appeal, and I think that was part of the argument in front of Judge Coffin, is the effect of the stay of that judgment on his ability to release it. I think we as a State thought that he probably couldn't. I think he thinks he has concurrent jurisdiction. My understanding is he's looking into having Mr. Heath evaluated for release and is thinking about it, and did ask us just to tell you that he's thinking about it. I'm not sure what. This case has been expedited fairly. Yes. Vigorously, as I recall. Yes. And my intent today was really to talk a little about the AEDPA review standard, because I think that that's the party's primary fight, and then I wasn't going to go through each of the individual claims, because there are so many of them and each of them are so fact-specific. But I am happy at any time to jump into your questions about the particular claims. Now, under AEDPA, a federal court can grant habeas relief, as you know, only if the State court decision denying relief is contrary to or based on an unreasonable application of clearly established Supreme Court law or based on an unreasonable determination of the facts. Now, under that standard, which the Supreme Court has taken a lot of time to elaborate over the past year, this Court's review is highly deferential, particularly in Strickland claims. The Court in Knowles said that in a case involving a Strickland claim, which is a very general standard, review is doubly deferential. And what this Court is looking at, or any federal court is looking at, when it reviews the resolution of a Strickland claim in the State court, I think is whether the State court's resolution of that claim falls within sort of a reasonable range of outcomes. You know, we don't have much from the State courts in this case. We've got a kind of a bench ruling at the trial level of the collateral attack saying, well, you know, I think this is okay. And then there's a, what, a one-sentence affirmation by the Court of Appeals. We don't have a lot of analysis to defer to from the State, do we? Well, actually, in terms of what we see coming out of State post-conviction courts, this ruling from the bench was fairly extensive. And I think it gives enough of the State court's reasoning for resolving the particular claims, at least most of them, that this court does need to review what that, what the State court did under the AEDPA standard. I guess the question I would have most interest in is the failure to move to suppress the identification. It seems to me that's the most significant claim that the petitioner made. And I think reviewed under the reasonableness standard, the State court's rejection of that claim was reasonable. The State court rejected that claim, finding that the lineups weren't impermissibly suggestive. And I think if you look at the evidence that goes to whether they were impermissibly suggestive, that conclusion is reasonable based on that evidence. And the first evidence is the three sets of the lineups, which we've included in Volume 5. I'm sorry. I'm not hearing you well. The first set of evidence are the lineups, the photo lineups themselves. And they're all included several places, but the color versions are in Volume 5 of the excerpts. But the judge who dealt with this on post-conviction review never seemed to, he doesn't mention, he seemed to think there was a complaint about a, what he calls a throwdown. But he didn't, he never says or seems to quite, so there's no indication he took into account that this was the third one, that it was months later, and the other two, Mr. Cameron had not been able to identify the person, and that this was therefore not just a classic situation. He regarded it as a classic situation of a challenge to any idea of this kind, but this was rather a unique set of facts, was it not? A couple. I think the post-conviction court did understand that there were the three sets of photo. The case was briefed fairly extensively before the post-conviction court, particularly by Petitioner. He filed a memorandum of law, Exhibit 1, which is included in our additional excerpts, and I realized after I included it in that that Petitioner had included it in a supplemental. He never, I mean, in his fairly short account, he says, he goes on and says the primary procedure for identification is throwdowns. The key to a good throwdown is non-suggestive procedures, and the throwdowns, while they may not have been ideal, were permissible, and any objection to those throwdowns would go to their value and not to their admissibility. But, of course, there was only, he talks in the plural, but the only problem was with regard to the third one, and he never talks about the sequence at all. And I viewed it in the context of the arguments which were made to him, which were this procedure, this set of three throwdowns were impermissibly suggestive. I think his use of the plural refers to the procedures that were employed. At least that's how I've always read the decision. And then if you look at the evidence of what those photo throwdowns look like, I think a fact finder reasonably could infer just from looking at the pictures that those alone were impermissibly suggestive. Petitioner's theory is that the repetition of the image of Petitioner in each of those throwdowns resulted in some degree of suggestion. And our position is that if you look at the picture that was used of him in each of those throwdowns, he looks very different in each of those pictures. And so that repetition didn't create some inference. What about the, it seems pretty clear that Cameron thought that ultimately he was supposed to pick a picture from the last throwdown. And that's another, again, I'll step back, why I think the standard of review is important here. I think Cameron's comment on that during the trial could be read plausibly two different ways. I think. Maybe, but the judge never mentions it. Correct. He doesn't mention it. So that's another hole in his analysis. He just doesn't mention it. And I don't think that, you know, this Court has said that a state post-conviction court doesn't have to mention every bit of evidence that it's considering. He did not mention any of the evidence that would have made this a hard case, none of it. And still, I don't think that should give this Court cause to doubt his ruling. Because, again, if you look at the briefing on the issue, which is what the Court had read before ruling on the issues, it laid out the facts extensively. It laid out the briefing, laid out the evidence, particularly Petitioner's briefing. And so I think it's reasonable to assume that that's what the state post-conviction court was operating on when it's made its ruling about the fact. It's reached its conclusion that the throwdowns were not so impermissibly suggestive so as to require any kind of suppression. But, again, back to Cameron's comment on the record. I think it can be read two ways. It can be read the way the district court read it, which is Cameron thought that he had been told to pick the guy out. I think it can also be read in context throughout the trial. If you look at Cameron's testimony, he frequently wasn't hearing, and he sometimes appeared confused by the questions. And so I think given his answer to the prosecutor's follow-up question when he confirmed that he hadn't been told to pick a particular person out, it would also be reasonable to read that as saying that he was just told, you know, to tell anybody, giving them a lineup, to identify the person if the person happened to be in there. And so read that way, it supports the state court's ruling. You know, read the other way, as the district court read it, it would support the district court ruling. So, again, I think the lens through which you view the state court ruling is important here. We have to find the state court was unreasonable. I mean, it's not enough that the state court's erroneous. It has to be unreasonable. Exactly. That's why ‑‑ What's the most unreasonable thing you did? The most unreasonable thing that the state court ‑‑ I don't think the state court did anything, as is our position in the brief, that's so unreasonable that it would require, you know, this court to reject its decision. I will address ‑‑ the petitioner has two points that he makes about the state court's decision. He suggests, you know, to give this court cause and give the district court cause to disregard it. And the first was Judge Jack's statement that he had not read the police reports on the record, and his petitioner points out that that's, you know, the police reports are where the reports of the throwdowns were contained. And I think that that doesn't ‑‑ shouldn't give this court cause to disregard the state court's decision because those facts contained in the police reports were not disputed, and they were contained in the briefing that was presented to the state court. And Judge Jack did confirm on the record that he had read Petitioner's Exhibit 1, which is petitioner's memorandum that says, you know, that goes over all the identification issues. And so I think that memorandum in particular provided the state court with the facts that needed to resolve those claims. Petitioner's other argument as to why this court and why the district court properly decided to review these claims de novo rather than through the EDPA lens was that Judge Jack made that comment about 2040 vision. I think he says, isn't a bad situation as far as a person's eyesight is concerned. It may be correctable for the purposes of glasses. And again, that's a comment by the court that's susceptible to several different readings. The first reading is the reading that the district court gave it, which is that the state court had found that Cameron's corrected vision was 2040. But I also think it's a statement that's susceptible to another reading that's consistent with the evidence that was before the state court, and that was that Cameron had 2040 vision with his glasses but had gone to get stronger glasses to correct that 2040 vision. So the statement's ambiguous, and I think under those circumstances, under EDPA this court should read the statement in the way most favorable to the state court's decision as opposed to against it. Should counsel have consulted with a doctor and gotten some sort of medical opinion on Cameron's eyesight? Should counsel have? Was it ineffective? Was it constitutionally inadequate assistance? I don't think it was under the circumstances of this case for a couple of reasons. One, there's a problem with that. Both Davis and Cameron were able to identify honeycut quite clearly, which indicated that something was okay with their eyesight, and counsel actually made use of that fact in closing argument when he argued, look, they identified honeycut, but their identifications of petitioner have never been this strong. From that shouldn't even infer that petitioner wasn't there. And sort of tracking down and attacking his eyesight wouldn't help that. I think also under these circumstances it wasn't unreasonable for him not to do that because he had Cameron's statement saying, I didn't get a good look at the guy. And the eyesight doesn't really factor into it when you have a witness who's saying, you know, I didn't see the guy in the first place. So under those circumstances I don't think, you know, counsel was constitutionally ineffective for not pursuing that line of attack. If you have any time, you should do that. Thank you very much. May it please the Court, Thomas Hester for Petitioner O'Pelley, David McDonald-Heath. I'll try to hone in on where the discussion has been. I had intended to start by sort of looking at page two of the reply brief and going through the first three points, all of which I think misstate. I won't do that beyond saying on the first two points, the State has taken the contrary position twice on each of those, including on page four of its briefing for a stay in this Court where it stated that Ms. Davis never identified Petitioner. But the third point I was going to make, I'm going to go ahead and make, because I think it relates to deference and it relates to the ---- What about this Jimmy Foster point? I'm worried about that. Is there anything in the record that shows that he was called Jimmy? I don't believe there is, but let me address that before I go on. I think had counsel done his job about Jimmy Foster or James Foster, had counsel questioned Officer Renfro when he was on the stand about Foster lying, about living with Ms. Honeycutt when he says, I just met her today, had he established they'd been seen multiple times in the area, the State would have had to deal with that and the fact that when he is first arrested in New Mexico, Mr. Heath says, I did the Wilkes-Dee-Philippo thing with her, but not the other, talk to Jimmy. Now, he also says, I'll deal information about dealing methamphetamine. Another thing they didn't learn about Foster was that Foster was on probation for methamphetamine, something that the District Court mentions. The prosecutor, if I'm the prosecutor in summation, is going to either need to argue But it's sort of odd that you didn't put any evidence, or whomever, didn't put any evidence in the post-conviction stage about Foster. There is evidence as far as his description, as far as his I mean, it's all from the original record, but there's nothing new, is there? No, in post-conviction, Mr. Heath puts in his DMV records that show his height, weight, shows that he fits the description. He subpoenaed those and those are in the record. That's actually But not that I knew James Foster by the name of Jimmy, or that I knew James Foster at all. No, and Or I met James Foster when I said, go ask for Jimmy. That, I believe, is in his deposition testimony in the post-conviction case. Is it? I believe so. I won't promise you, but I think it is. It's clear to me. Let me just make a point. Arguing at trial against that evidence, the government would either need to say, the state would need to argue, James and Jimmy are different, or it would need to argue that Heath is trying to point the finger at Foster because Honeycutt told him about it. I would think that the latter position would be the more reasoned one to take. But James and Jimmy, I mean, that distinction I don't think is a very salient one for a jury. In terms of factual record, the third point in the reply brief, the third bullet point, that the state makes is that detective Wright's training, which is put in the record of post-conviction, had generically entitled classes that could have meant a lot of different things. And so Mr. Heath's failed to demonstrate and seeks an impermissible inference that it didn't include training and proper ID. I would point the Court to 369 of the excerpt of record that he's in the subpoena Mr. Heath filed in that case, and particularly paragraphs 5 and 6. In 6, he requests of the Jackson County a complete description of the course material provided and exactly what was taught in the courses offered to Detective Greg Wright that he participated in on the subject of proper practices for preparing and displaying photo spreads of eyewitnesses to alleged crimes prior to 99. Well, would you come to what the State Court of Appeals did that was unreasonable? Sure. Let me turn to that. I believe that they're wrong under both D1 and D2. While my briefing has focused... Not wrong, unreasonable. Unreasonably, yes. I believe that under D2 there's an unreasonable determination of the facts, and I do want to flesh that out a bit and I want to use Taylor v. Maddox as sort of the threshold there. In the discussion with counsel for the state, there was a lot of discussion about what the state post-conviction court said and didn't say, and it struck me as I was rereading that this morning at breakfast that one of the very few facts that are found in there is about the eyesight and that is, as the district court found, erroneous and objectively and unreasonably so. The statement from the post-conviction judge is that 2040 isn't a bad situation as far as a person's eyesight is concerned. It may be correctable for the purpose of glasses for reading and things, but it doesn't necessarily impair his identity to identify someone. I think that statement clearly, if it may be correctable, then it's what... 2040 may be correctable, then he's talking about uncorrected vision, and that, as the district court found, is erroneous. But 2040 is... The vision of one of my eyes is about that. I can see you and so forth. No, it's not. No, the problem was that this guy's eyes were not 2040, uncorrected. That's right. Uncorrected, they were 2040. Uncorrected, we don't know what they were, but they were clearly worse. And, I mean, it's salient to look at. At the time of the second identification procedure, Mr. Cameron tells the officers, I couldn't get a good look at the guy. I was being beaten and my eyes swelled shut. I think that's a pretty salient fact for the considerations, which can be that you asked about sort of the problems with it. But let me try to... All those problems were put to the jury on Cameron's... Some of them were, yes, but many were not. And, of course, the identification wasn't contested. There are a total of, I believe, eight findings by the district court of ineffective assistance, all relating to the central issue of identification and the, I think, central sort of injustice in this case, or where the case came off the tracks, of combining the two defendants where Mr. Heath acknowledged his involvement in the first one, but wasn't, or says he wasn't, and I think the record strongly suggests he wasn't, involved in the second. So, yes, the jury did hear some things, but I absolutely urge that the district court was correct in finding ineffectiveness by counsel. Just to point to a couple of points in Taylor v. Maddox, because I think there's two facts of D2 failures here where the fact finding is unreasonable and doesn't require deference. The AATP says no deference. First, the state misapprehended or misstated the record before it. That's the vision piece we just talked about. It wasn't certainly a material, factual issue in this case, in this trial. And, secondly, where the court's fact finding process is undermined, where the state court has before it, yet apparently ignores evidence. And there are sightings of Miller et al. The police reports here, the state now relies on the argument, Well, the judge said he read the record, and he didn't read the police reports and wasn't in it because they weren't relevant. First of all, argument isn't evidence. I mean, if you're looking at a factual issue, you've got to look through to the record. Secondly, the PCR judge who refused to read the reports also demonstrated his lack of understanding of the record. And it's notable that he was not the judge who had handled the case previously. The judge who'd been involved in all of the pretrial litigation was a Judge Urodwin. This comes up in the trial, the PCR trial. Judge Jack substituted in. So he hadn't been involved in the issuing of subpoenas, investigative funds, and all types of things. But turning to the transcript there at 753 and 754, the judge responds to Mr. Heath's argument about a witness and getting some stipulations about his investigator twice by saying, I don't recall any portion of your petition that relates specifically to lack of investigation. Mr. Heath responds, oh, yes, sir, I did. As a matter of fact, I made that claim that my attorney was inadequate and ineffective when he failed to investigate the witnesses and the crime scene. Would you like me to get that out for you? Judge Jack says, I'll ask counsel. Talk him to the state. Do you recall, counsel? You may have a better recall of this than I. Your Honor, I'm trying to look. Then Mr. Heath points him to the amended petition at 315 of the excerpt of record where that claim is. Was Mr. Heath representing himself at that point? He did represent himself, yes. Rather well. Very well, yes. Also, if you look at the deposition from his – when he was deposed in post-conviction, approximately 20 pages of it from 651 of the ER to 671 is about the investigation and the failures of the investigation. So the judge's reading of the record was not particularly – didn't lead to a lot of retention. Well, you've still got to – each time you've got to show unreasonableness. Well, if you have – unreasonableness has little fact-finding, then, I mean, under Taylor v. Maddox, under the ADPA, there's no deference due. And that is what one of the – I mean, the district court found both of those. Let me turn to D1 deference and the findings themselves being unreasonable. As the courts discussed, they weren't articulated in much detail at all. The district court referred to the judgment which is issued from the banshee at the end of the PCR trial as a judgment in a summary fashion that addressed some but not all of Mr. Heath's claims. It was an unreasonable application of strickland, as the district court found. Well, what about – with regard to the suppression in particular, is there any rule that a determination is unreasonable if it doesn't evidence a understanding of the critical facts as long as – in other words, I would say that his analysis left a lot out. But it didn't demonstrate that he didn't take that into account. It just left a lot out. Is an omission of that kind enough to make it unreasonable? I think the courts have said a silent record, you can't – you know, that doesn't render it unreasonable. You have to look behind and see what's there. Apparently what was there, your opponent argues, was a lot of argument about precisely those things, so there's no basis for presuming he was ignoring it. That's her argument. In other words, even though he doesn't, in his analysis, recognize that there were actually three throwdowns and doesn't recognize the statement – doesn't discuss or deal with the statement about I thought they wanted me to pick out the guy and doesn't deal with the question of whether if the throwdowns were unduly suggestive, whether the identification was no longer – nonetheless valid, and so there are lots of big holes in the analysis, is that enough to make it unreasonable? And I think the question parses between D-1 and D-2. I think – No, we're now talking D-1, as I understand. Okay. Because there's no D-2 problem on that ground, is there, as to that issue? Well, I think that where you go to the lack of fact-finding, and particularly in a case like this, and a refusal – coupled with the refusal to read the police reports is on the D-2 side. I think on the D-1 side – But the particular issues that you pointed to in terms of errors didn't deal with the suppression. Well – At least not directly. I mean, it dealt with the eyesight. Certainly the ability to observe is critical. I mean, I think if you look at the other aspects that are typically weighed in a weighed hearing, and it's going to be an opportunity to view the sort of – But those, as I understand it conceptually, only come in after you decide that there's something unduly suggestive about the photo IDs to begin with, no? Yes, I agree. And perhaps I can turn to that. First of all, the first array, no identification, that's right after the events. The second array, the sketch array, comes out a few weeks later. I would suggest to you that this procedure should give any court great pause. I can't find any occasion other than this case where you have a police sketch artist who is employed to sketch not the described perpetrator of the crime by actual eyewitnesses and or victims, but the way that the person suspected by the police would look if he fit the – that is to say, if his facial hair was gone and he fit the description. I think that is a huge indicia of suggestiveness in the pattern of procedures that are used here, and any time I think that something that appears to be completely novel is done, that should be troubling. In this case, I think it is all the more troubling because in the course of this litigation, in its reply in the district court, which is in the clerk's record at 40, page 8, line 2, the state dismisses the drawing saying the composite drawings were not much good. I think it's very difficult to understand. But he didn't identify anybody based on those drawings, so what's the problem? No, but the drawings were organized around Mr. Heath. You look at all of the circumstances, sort of the totality of the circumstances, look when you're looking at suggestiveness. That is our second procedure. After that, Mr. Cameron testifies at the grand jury, which indicts Heath, and it's four months later before Detective Wright returns with a new array, contains no admonitions, as the district court highlighted, and Mr. Cameron understands that Wright wants him to pick the guy out. Now the state argues that that's subject to sort of different interpretations in light of what's kind of come before, and in light of just Mr. Cameron's ability to answer questions. It was clear that he thought he was supposed to pick the guy out, and there were no admonitions, and it's clear, and it's clear because the state didn't provide anything to the contrary, that Wright had no training about avoiding suggestive procedures. Moreover, this is after the indictments were obtained. It is for the purposes of generating evidence, essentially, as the district court found, and it's after Mr. Cameron has told him when he came with the second array that I didn't get a good look at the guy, I was beaten and my eyes swollen shut. So I absolutely think that there is a great deal, and the district court actually does a better job of marshalling all of the different elements about that than I have here today. So your time is about out, so can you wrap up, please? Yes, yes. I want to point out the trial counsel said there was no basis to suppress the identification. I think that is huge in seeing that the first problem of Strickland is Matt. Also, if there had been a motion to, if he had gotten correct on the law and filed the motion, then even if the court had only suppressed the out-of-court ID or suppressed none, counsel would have been tuned in to the other errors that came later, which he repeatedly sort of botched issues about that relate directly to identification. About what? Related directly to identification, the failure to impeach through medical records, which in this case showed Cameron suffered from cataracts with a 40-watt light bulb. He would be particularly unable to, I think the expert pieces here in a normal case wouldn't be an effective assistance, but on the peculiar facts here with the medical issues, with the vision issues, the district court was absolutely right. The one other point I guess I'd say about identification that struck me this morning as I was preparing is the hair length issue, because this honey cut was very specific at trial, that the male perpetrator had short hair like Detective Wright at trial, and when Mr. Heath is arrested three weeks later in New Mexico, he has long hair below his ears, and it happens that Mr. Heath put photos of both of those in the record. They can be found at ER 716 and ER 728. Your time is up.  Thank you very much. I'll just respond briefly to Mr. Hester's argument about setting aside the EDPA standard on the fact finding. Again, with respect to I think his argument with the police reports is that the trial court's failure to read those would justify throwing out all of its findings and conclusions, and again my response to that is those facts, which are undisputed, were before the court, and specifically I'm looking at are eight additional excerpts of record, 14 and 15, and page 20 where a petitioner in his memorandum quoted the trial transcript, the interviews, and the police reports so that the judge wouldn't have to sift through them. He could just read them in the memorandum. With respect to the eyesight finding, I've given my best answer for that, but again even if this court were to conclude that the post-conviction court did make an erroneous finding there, that would only justify throwing out that fact, and I think the best that gets petitioners is de novo review on that claim, which I think fails for my discussion and opening argument with Judge Canby. On the third display, photo display, you said you can interpret Cameron's statements two ways, and one of which would be that he felt he had to pick somebody out of that, and the other would be just that he had to pick somebody out if he found the one that committed it, but if he testified to the grand jury, he knows there's been an indictment, wouldn't he assume that they would put the guy who's been indicted into the display when they tell him go ahead and pick the guy? I don't think you can read that from the record, and I don't have anything on that point, but the case, sort of the evidence here best indicating that people wouldn't do that would be, Wilson DeFilippo in the case failed to identify petitioner in court during the trial. All we have are the out-of-court IDs there, and one might argue that they would assume he was the person sitting at the defendant's table and identify him that way, but they said they didn't see him, and I don't think Mr. Cameron necessarily did. In court, what was Cameron's in-court identification again? He did make an in-court identification. So that's the one, yeah, okay, and it's, but Ms. Davis did not, as I recall. She said, I think he's in the striped shirt, I'm not sure, or I'm not sure, it was very tentative, what she said includes closing argument, defense counsel argued that, her defense counsel argued that it wasn't a true identification. What about the hair issue? They said that he had short hair and at any known time that he always had longer hair. And that's a discrepancy with the description. I think counteracted in part by the description of the height, which does match petitioner's height. I think the key fact was both Honeycutt and petitioner were the same height and the victims described them as being the same height and unshaven. The hair issue was a weak point. How soon after the crime were they arrested in New Mexico? I believe it was 18 days. The crime I think was July 12th, and I think they were picked up, I think Honeycutt came in on June 30th. And the second, the third photo lineup was a photo of him from New Mexico, when he was arrested in New Mexico. Right. So that shows what his hair was like then. Exactly. Thank you. Thank you. Probably not. Thank you very much.  Thank you. All rise.
judges: Canby, Noonan, Berzon